UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

Appeal No. 25-12770-TT

---

**TAMARA OGIER, AS TRUSTEE FOR THE BANKRUPTCY ESTATE OF BRITTANY DAKOTA BOSLEY ET AL.,**

**Plaintiffs – Appellants,**

**vs.**

**INTERNATIONAL FOLLIES, INC. D/B/A CHEETAH,**

**Defendant – Appellee**

ON APPEAL FROM JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
District Court Docket No. 1:21-cv-2421-VMC

---

# PRINCIPAL BRIEF OF APPELLANTS

---

**DELONG, CALDWELL, BRIDGERS, FITZPATRICK & BENJAMIN, LLC**

101 Marietta Street NW
Suite 2650
Atlanta, Georgia 30303
(404) 979-3150
matthew.herrington@dcbflegal.com
charlesbridgers@dcbflegal.com

Matthew W. Herrington
Georgia Bar No. 275411
Charles R. Bridgers
Georgia Bar No. 090791

*Attorneys for Plaintiffs–Appellants*

## Certificate of Interested Persons

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Appellants hereby file this Certificate of Interested Persons and Corporate Disclosure Statement.

The following persons or entities, to the best of Appellants' knowledge, have an interest in the outcome of this matter:

**Appellants:** Tamara Ogier and Brittany Bosley

**Appellees:** International Follies, Inc. d/b/a Cheetah

**United States District Judge:** Hon. Victoria Marie Calvert

**Counsel for Appellants:** Matthew W. Herrington and Charles R. Bridgers; Benjamin; DeLong, Caldwell, Bridgers, Fitzpatrick & Benjamin, LLC

**Counsel for Appellees:** Andrea Pawlak; Constangy, Brooks, Smith & Prophete, LLP

Dated: November 5, 2025.

*s/ Matthew W. Herrington*
Matthew W. Herrington
Georgia Bar No. 275411

## STATEMENT REGARDING ORAL ARGUMENT

In this appeal, with a complicated procedural history involving two summary judgment orders, a motion for reconsideration, a remand to the District Court, and an amicus brief from the U.S. Department of Labor, Appellants ask the Court to weigh in on issues relating to a fairly recent amendment to the Fair Labor Standards Act relating to tip-sharing prohibitions. The Court has never previously had an opportunity to interpret these new statutory provisions. Specifically, the Court has never before been asked to determine the plaintiff's burden of proof with respect to an FLSA tip-sharing violation or what duties make a "supervisor" within the meaning of 29 U.S.C. § 203(m)(2)(B). Oral argument is more than appropriate in these circumstances.

# Table of Contents

Certificate of Interested Persons .......... C1

Statement Regarding Oral Argument .......... i

Table of Contents .......... ii

Table of Authorities .......... iv

Statement of Subject-Matter and Appellate Jurisdiction .......... vi

Statement of Issues on Appeal .......... 1

Statement of the Case .......... 2

1. Proceedings Below .......... 2
2. Statement of Facts .......... 4
3. Standard of Review .......... 10

Summary of the Argument .......... 10

Argument and Citations of Authority .......... 12

1. The District Court Properly Defined "managers or supervisors" in 29 U.S.C. § 203(m)(2)(B) as "individuals with the primary duty of 'management' " .......... 12
2. The District Court erred in finding that Defendant's "Floor Managers" were not Bosley's "managers or supervisors" within the meaning of 29 U.S.C. § 203(m)(2)(B) .......... 14
3. The District Court erred in finding that Plaintiffs failed to show that Cheetah had knowledge of and "allowed" dancers to share tips with house moms in violation of 29 U.S.C. § 203(m)(2)(B) .......... 21

a. Defendant did not argue that it lacked knowledge of Plaintiff Bosley's tip sharing, and the District Court was not permitted to rule on that issue *sua sponte* without providing Plaintiffs notice and an opportunity to be heard ....22

b. The knowledge of managers and supervisors is imputed to an employer ....23

c. Defendant had (at least) constructive knowledge of its managers' FLSA violations ....26

4. Conclusion ....28

Certificate of Compliance with F.R.A.P. RULE 32(A)(7)....29

Certificate of Service .... 30

**Table of Citations and Authorities**


* *Allen v. Bd. of Pub. Educ.*,
495 F.3d 1306 (11th Cir. 2007) .................................................................. 27

*Barcellona v. Tiffany English Pub, Inc.*,
597 F.2d 464 (5th Cir.1979) .................................................................. 19, 24

*Brennan v. Gen. Motors Acceptance Corp.*,
482 F.2d 825 (5th Cir. 1973) .................................................................. 23–24

*Carlisle Equip. Co. v. U.S. Sec'y. of Labor & Occupational Safety*,
24 F.3d 790 (6th Cir. 1994) .................................................................. 24

*Couch v. Clark*,
725 F. App'x 808 (11th Cir. 2018) .................................................................. 22

*Chevron, U.S.A., Inc. v. NRDC, Inc.,*
467 U.S. 837, 104 S. Ct. 2778 (1984).................................................................. 3, 12–13

*Goldberg v. Whitaker House Coop., Inc.*,
366 U.S. 28, 81 S. Ct. 933 (1961).................................................................. 19

*Gulf King Shrimp Co. v. Wirtz*,
407 F.2d 508, 512 (5th Cir. 1969) .................................................................. 24

*Hellmers v. Town of Vestal*,
969 F. Supp. 837 (N.D.N.Y. 1997).................................................................. 24

*Highmark Inc. v. Allcare Health Mgmt. Sys.*,
572 U.S. 559, 134 S. Ct. 1744 (2014).................................................................. 10

*Holloman v. Mail-Well Corp.*,
443 F.3d 832 (11th Cir. 2006) .................................................................. 10

*Huff v. Dekalb County*,
516 F.3d 1273 (11th Cir. 2008) .................................................................. 10

*Kesler v. Barris, Sott, Denn & Driker, PLLC*,
482 F. Supp. 2d 886 (E.D. Mich. 2007).................................................................. 23

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369, 144 S. Ct. 2244 (2024).................................................................. 2, 3, 10, 12

*Massey v. Cong. Life Ins. Co.*,
116 F.3d 1414 (11th Cir. 1997) .......................................................... 22

*Piedmont Hosp., Inc. v. Palladino*,
276 Ga. 612 (2003) ............................................................................ 19

*Reich v. Department of Conservation & Natural Resources*,
28 F.3d 1076 (11th Cir. 1994) ............................................................ 24

* *Roe v. City of Atlanta*,
456 F. App'x 820 (11th Cir. 2012) ...................................................... 22

*Sidell v. MedMark Servs. Inc.*,
No. 2:16-cv-176-RWS, 2017 U.S. Dist. LEXIS 220486,
2017 WL 6994574 (N.D. Ga. Aug. 3, 2017) ........................................ 23

*Stickle v. SCI W. Mkt. Support Ctr., L.P.*,
No. 2:08-cv-00083 JWS, 2012 U.S. Dist. LEXIS 8255 (D.
Ariz. Jan. 24, 2012)............................................................................... 24

**Other Authority**

19 Moore's Federal Practice - Civil § 206.04 ......................................... 10

28 U.S.C. § 1291 ......................................................................................vii

28 U.S.C. § 1331 ......................................................................................vii

29 U.S.C. § 201 ........................................................................................vii

29 U.S.C. § 203(g) ......................................................................................21

* 29 U.S.C. § 203(m)(2)(B) ........................................... 1, 10, 12–14, 20–21

29 C.F.R. § 541.100 ............................................................................ 11, 14

* 29 C.F.R. § 541.102 ............................................................................ 14, 18

29 C.F.R. § 785.11 ......................................................................................21

Fed. R. Civ. P. 56(f) ........ 22

O.C.G.A. § 51-2-2 ........ 19

U.C. Berkeley Administration, “What's the difference between a supervisor and a manager?,” https://hr.berkeley.edu/node/3818 (last accessed November 5, 2025) ........ 18

## Statement of Subject-Matter and Appellate Jurisdiction

The District Court was vested with original jurisdiction pursuant to 28 U.S.C. § 1331 because this action arose under the Fair Labor Standards Act of 1938 as amended, 29 U.S.C. § 201 *et seq*., ("the FLSA") a federal statute affecting interstate commerce.

This Court has jurisdiction over this appeal from the District Court's Order [Doc. 88] of August 1, 2025, granting Defendants–Appellees' Motion for Summary Judgment pursuant to 28 U.S.C. § 1291. Plaintiffs–Appellants timely filed their Notice of Appeal. [Doc. 90]

## Statement of the Issues on Appeal

1. Whether the District Court erred in ruling that Cheetah "floor managers" were not Plaintiff Bosley's "managers or supervisors" within the meaning of 29 U.S.C. § 203(m)(2)(B).

2. Whether the District Court erred in finding that Plaintiffs failed—as a matter of law—to show that Cheetah had knowledge of and "allowed" dancers to share tips with house moms in violation of 29 U.S.C. § 203(m)(2)(B).

## Statement of the Case

### 1. Proceedings Below

Plaintiff–Appellant Tamar Ogier, in her capacity as trustee for the bankruptcy estate of debtor Brittany Bosley, filed her Complaint on June 14, 2021, alleging violations of the overtime requirements of the Fair Labor Standards Act by Defendant–Appellee International Follies, Inc. d/b/a Cheetah with respect to Bosley. [Doc. 1] Defendant filed its Answer on July 2, 2021. [Doc. 6] After receiving leave to amend, Co-Plaintiffs Ogier and Bosley filed their First Amended Complaint on December 30, 2021,[1] [Doc. 17] and Defendants filed their Answer to the First Amended Complaint on January 3, 2022. [Doc. 31] Defendant filed a Motion for Summary Judgment on May 20, 2022, [Doc. 42] to which Plaintiffs filed a Response. [Doc. 47] The District court issued its Order granting summary judgment in favor of Defendant on March 27, 2023. [Doc. 53] Plaintiffs filed a Motion for Reconsideration on April 3, 2023 [Doc. 56], and the Court issued an Order denying the Motion on December 21, 2023. [Doc. 63]

After appealing those decisions to this Court in Appeal No. 23-14225 (hereinafter Ogier I) the United States Supreme Court decided *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 144 S. Ct. 2244 (2024), in which it

[1] Raising identical FLSA claims by Bosley that did not belong to the bankruptcy estate, as they accrued after the bankruptcy filing.

overturned *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). As the District Court's previous summary judgment order had relied in part on the heightened regulatory deference standard announced in *Chevron*, this Court issued an order partially remanding the case to the District Court for reconsideration of its summary judgment order in light of *Loper*. [App. Doc. 55-1]

On remand, the District Court ordered the parties to simultaneously file supplemental briefs limited to five pages addressing only "(1) Each statutory term, phrase, or clause the party asserts the Court must define, (2) a proposed definition, and (3) any supporting citations to persuasive materials such as dictionaries, case citations, or agency materials," and without otherwise arguing the merits of the case. [D.C. Docket Order of December 4, 2024] Response briefs were permitted solely to the extent that they "respond[ed] to any defined term not included in the party's own opening brief." [D.C. docket-only Order of December 4, 2024] Upon consideration of the parties' supplemental briefs, the District Court again granted Summary Judgment in favor of Defendant. [Doc. 88] Plaintiffs timely filed a notice of appeal. [Doc. 90]

## 2. Statement of Facts

**Dancer Relationship to Floor Managers and House Moms**

Defendant operates Cheetah, an adult-entertainment establishment in Atlanta, Georgia. Plaintiff Bosley was employed at Cheetah as an exotic dancer from November 8, 2019, through March 18, 2020, and again from June 8, 2020, until February 3, 2022. [Doc. 42-7 (Bosley Deposition) – pp. 10–11, 32–50, 213–279] Cheetah treated Bosley as an employee and paid her $2.13 an hour, plus tips. [Doc. 42-7 – pp. 11–12]

Cheetah employed "floor managers" who exercised a degree of control over Bosley and other dancers in numerous ways. They handled dancer complaints about customers and other dancers when the situation was urgent [Doc. 47-1 (Bosley Declaration) – pg. 3], and they would direct dancers to work in different areas of the club or to stay away from specific customers and dancers. [Doc. 47-1 – pg. 4] Floor managers were also responsible for administering breathalyzer tests, observing dancers for signs that they are overly intoxicated and unsafe to drive, checking VIP rooms for dancer safety, and enforcing no smoking rules. [Doc. 47-1 – pg. 5] They also monitored the premises to ensure that dancers were safe when coming and going from the property. [Doc. 47-1 – pg. 5] Floor managers were responsible for monitoring the club's legal compliance with respect to laws prohibiting customer–dancer contact, prostitution, and sexually explicit behavior.

[Doc. 47-1 – pp. 5–6; Doc. 42-7 – pg. 87] When a floor manager believed that they had witnessed a legal violation, they were authorized to order a dancer off stage or out of a VIP performance. [Doc. 47-1 – pp. 5–6] Floor managers also made recommendations to customers for specific dancers to do performances for specific customers in private VIP rooms; these recommendations were entirely at the floor manager's discretion and the performances that resulted from their recommendations were a major source of dancer income. [Doc. 47-1 – pp. 4–5] Floor managers informed dancers when their turn to appear on stage had come to ensure that they appeared at that time. [Doc. 42-7 – pp. 61, 85] On one occasion, a floor manager became very upset when Bosley was late to a stage set and said that if it happened again, he wouldn't let her check into VIP all night. [Doc. 42-7 – pg. 85]

Cheetah also employed "house moms." House moms were responsible for interviewing prospective dancers who wanted to audition. [Doc. 47-1 – pg. 2] That process entailed filling out paperwork with the house mom's assistance and answering a series of questions asked by the house mom. [Doc. 47-1 – pg. 2] Following that interview, if the house mom believed the prospective dancer was a good candidate, she would then give her application materials to the general manager for a final stage audition. [Doc. 47-1 – pg. 2]

House moms also trained newly hired dancers, went through club rules with them, explained club operations, and answered questions about how to perform the job. [Doc. 47-1 – pg. 2] House moms decided whether or not to approve dancer requests to trade or miss a shift. [Doc. 47-1 – pg. 2] They regularly directed dancers during their shifts, ordering them to appear on stage or the floor when needed and telling them to change their clothing if it is problematic or unattractive. [Doc. 47-1 – pg. 3] If a dancer showed up late for her shift, the house mom could send her home. [Doc. 47-1 – pp. 83–84]

House moms kept written records relating to attendance, attendance, and incidents that needed to be communicated to management, who were often not present, leaving the house moms in charge. [Doc. 47-1 – pg. 3] House moms handled complaints by dancers about customers or other dancers. [Doc. 47-1 – pg. 3] And even when a manager was present, the house mom was typically the person that a dancer went to with such problems. [Doc. 47-1 – pg. 3]

House moms disciplined dancers by sending them home if they were too drunk, had missed stage sets, had shown a bad attitude, or for any number of other reasons. [Doc. 47-1 – pg. 4] They regularly disciplined dancers when no manager was present. [Doc. 47-1 – pg. 4]

Cheetah house moms regularly gave feedback to dancers about their job performance and instructed them how to perform their jobs better, such as dancing

tips, how to approach and interact with customers, or reminding them about the rules of when certain articles of clothing should be removed. [Doc. 47-1 – pg. 4]

House moms also commonly policed dancers' clothing and footwear, telling them to change them if they did not comply with club policy (e.g., four-plus inch heels and open toes are required) or simply if they find them unattractive or too worn. [Doc. 47-1 – pg. 5] The house moms would refuse to let a dancer on stage if they do not approve of their clothing. [Doc. 47-1 – pg. 5]

Like floor managers, house moms were also responsible for administering breathalyzer tests, observing dancers for signs that they were overly intoxicated and unsafe to drive, checking VIP rooms for dancer safety, enforcing no smoking rules, and intervening when customers were unruly. [Doc. 47-1 – pg. 5] They also monitored the club's legal compliance with respect to laws prohibiting customer–dancer contact, prostitution, and sexually explicit behavior. [Doc. 47-1 – pp. 5–6]; [Doc. 42-7 – pg. 87] House moms were authorized to order a dancer off stage or out of a VIP performance if she believed a legal violation had occurred. [Doc. 47-1 – pp. 5–6]

As noted above, in addition to exercising disciplinary power, house moms and floor managers also regularly exercised the power to recommend specific dancers to customers for lucrative VIP performances. [Doc. 47-1 – pg. 4] And Bosley noticed that house moms gave lucrative VIP room assignments to those who tipped

them well, and house moms could withhold favors like permission to leave early if they were not happy with a dancer's tip outs back to them. [Doc. 42-7 – pp. 53–58; Doc. 47-1 – pp. 4–5]

**Tip Outs to Floor Managers and House Moms**

At the time Bosley was hired, she was shown a written policy *requiring* dancers to pay a percentage of their tips each shift to the floor managers and disc jockeys [Doc. 42-7 – pg. 208] The policy continued:

> There is no mandatory tipping. With the exception of any lawful tip pool that you may be required to make, the appliable law requires that you be allowed to retain all of your remaining tips. Management will not retain any of your tips. . . . Any entertainer who feels she has been subjected to any coercion, harassment or other intimidating actions to force her to share their [*sic*] tips must contact General Manger Jack Braglia . . . immediately.

[Doc. 42-7 – pg. 208] Thus, the policy did not clearly address—much less prohibit—tipping of house moms (who were not referred to as "managers" and whom Defendant has always maintained were not "managers"), and only purported to require dancers to report "coercion, harassment, or other intimidating actions to force her to share [her] tips" to the general manager. The policy was in no way, shape, or form a categorical prohibition on dancers sharing a portion of tips with floor managers (in excess of the mandatory amount) and house moms. It simply did not speak one way or the other about such "voluntary" tip outs to dancers' superiors.

In reality, after working at Cheetah, Bosley observed that floor managers and house moms would only recommend dancers for lucrative VIP performances if they knew that the dancer was going to tip them out "often and well." [Doc. 42-7 at pp. 53–54, 58] This resulted in a **widespread practice** of dancers tipping out floor managers in excess of the mandatory 10% tip pool contribution, and tipping out house moms who were not part of a formal tip pool:

> [they] would only recommend certain dancers to go to tables that wanted to do VIPs and spend a lot of money and stuff like that. They would only recommend the dancers to those tables ***if the dancer they knew that dancer was going to tip them out***. . . . ***The only way that bouncers would recommend you to tables is if you tipped them. . . . Same with like house moms***. They would let you leave early or maybe miss a day ***if you tipped them often and well***, but otherwise they wouldn't.

[Doc. 42-7 – pp. 53–54 (emphasis added)] Bosley further testified:

> ***everyone was doing it***. It doesn't sound very good, but ***it was just the way that the club worked***. Even though those signs were posted and everything, ***the club still ran that way against the rules***, and so ***I had to go with the flow*** to assist in my moneymaking with recommendations to tables, et cetera.

Doc. 42-7 – pg. 123:1–7 (emphasis added).

Given these circumstances and incentives, Bosley and other dancers at Cheetah regularly paid a portion of their tips to house moms and floor managers (in excess of the club's mandatory tip out to DJ's and floor managers). [Doc. 42-7 – pp. 94–97] Bosley personally noticed how floor managers would no longer recommend dancers to customers if they stopped tipping them on top of the mandatory 10% tip

pool contribution. [Doc. 42-7 – pp. 54–55] Bosley also observed that house moms began recommending customers to her after she got on their good side by tipping them well. [Doc. 42-7 – pg. 58]

### 3. Standard of Review

"This court reviews de novo a district court's grant or denial of summary judgment." *Huff v. Dekalb County*, 516 F.3d 1273, 1277 (11th Cir. 2008) (citing *Holloman v. Mail-Well Corp*., 443 F.3d 832, 836 (11th Cir. 2006)). A trial court's conclusions on questions of the application, interpretation, and construction of law are reviewed *de novo* on appeal. *Highmark Inc. v. Allcare Health Mgmt. Sys*., 572 U.S. 559, 134 S. Ct. 1744 (2014). A circuit court may substitute its own judgment regarding a conclusion of law made by the trial court. 19 Moore's Federal Practice - Civil § 206.04 (citing cases).

## Summary of the Argument

Plaintiff has brought FLSA claims seeking reimbursement of the portion of her tips that her supervisors and managers at the Cheetah nightclub took from her in violation of 29 U.S.C. § 203(m)(2)(B). In its second summary judgment order—after Plaintiffs' first appeal was remanded to the District Court in light of *Loper*, the District Court correctly adopted Plaintiff's proposed definition of "managers or supervisors" in 29 U.S.C. § 203(m)(2)(B) as "an individual who has the primary

duty of management.[2]" It erred, however, in determining, as a matter of law, that (1) Cheetah floor managers were not managers or supervisors prohibited from taking a portion of Plaintiff's tips, and that (2) Plaintiff had failed to provide evidence that Defendant had notice of and "allowed" Cheetah house moms to take a portion of Plaintiff Bosley's tips.

Cheetah's floor managers, while performing many duties shared by common "bouncers," had additional duties that rendered them the "supervisors" of Plaintiff Bosley and other Cheetah dancers. These included handling disputes (often without managerial oversight) between dancers and customers or with other dancers, disciplining dancers and directing their work, and functionally controlling dancers' access to lucrative private performances. The District Court erred in minimizing these activities removing them from the ranks of FLSA supervisors and imposing additional evidentiary burdens on Plaintiffs that do not exist.

As for Cheetah's House Moms, the District Court erred when it ruled that Plaintiff had failed as a matter of law to show that Defendant had notice of the improper tip-sharing and thus "allowed" it. There are several problems with the District Court's conclusion. First, Defendant never even argued at summary judgment that it had no notice of the tip-sharing with house moms. And as non-

---

[2] This definition is taken from the second element of the FLSA's executive exemption test at 29 C.F.R. § 541.100.

moving parties at summary judgment, Plaintiffs had no duty to address this issue or present evidence relating to it. By raising this issue *sua sponte* and failing to give Plaintiffs notice and an opportunity to be heard, the Court violated their right to due process. Second, Defendant had notice of the violation because the house moms are managers and the FLSA charges employers with constructive knowledge of management's actions and managers' knowledge. Third, Plaintiff did in fact present evidence that the impermissible tip-sharing was normal and widespread at Cheetah, and basically the club's *modus operandi*. Because the illegal practice was widespread, and because the FLSA imposes a duty on employers to inquire into their own operations, Defendant had—at the very least—constructive knowledge of the ongoing FLSA violations. Moreover, a jury would be entitled to look at the totality of the circumstances and find by a preponderance of the evidence of a rampant, widespread practice and find that Defendant more likely than not had *actual knowledge* of these practices. How could it not?

## Argument and Citations of Authority

### 1. The District Court correctly defined "managers or supervisors" in 29 U.S.C. § 203(m)(2)(B) as "individuals with the primary duty of 'management' "

This Court partially remanded Plaintiffs' previous appeal to the District Court for reconsideration in light of *Loper*, which overruled the *Chevron* deference standard that the District Court had relied on in its first summary judgment order

(adopting the Department of Labor's preferred definition of "managers or supervisors" at 29 U.S.C. § 203(m)(2)(B)). On remand, given *Chevron's* demise, the District Court adopted Plaintiffs' proposed definition, but ruled against Plaintiffs on separate grounds.

While Plaintiffs argue in this appeal that it erred seriously in its second grant of summary judgment, the District Court was correct on one important issue: "managers or supervisors" in the context of 29 U.S.C. § 203(m)(2)(B) should be defined as "individuals with a primary duty of management."

Although Defendant did not cross-appeal on this issue, it may attempt to argue in its response that this Court should overrule the District Court and adopt its preferred definition of "managers or supervisors," throwing up additional barriers to "manager or supervisor" status. This issue has been briefed repeatedly at this point (see Ogier I briefing by the parties and the Department of Labor as amicus curiae, in addition to the multiple rounds of briefing in the District Court). Plaintiffs will summarize only at this point, and will respond in further detail at the appropriate time, if Defendant actually makes such an argument.

"Manager" and "supervisor" as used in FLSA § 3(m)(2)(B) are not defined terms. The Department of Labor's ("DOL") Wage & Hour Administrator ("Administrator") issued a 2020 interpretive rule (effective March 1, 2021) propounding a definition consisting of a new, multi-prong test derived from the

FLSA's executive exemption. 29 C.F.R. § 541.100. That test thwarted Congress' intent to prohibit even lower-level "supervisors" from taking a portion of their subordinate employees' tips. The District Court saw that and adopted Plaintiffs' proposed definition, which is that a "manager or supervisor" is an individual whose primary duty is "management" within the meaning of 29 C.F.R. § 541.102. This non-exhaustive list of duties has been used in the context of the FLSA's executive exemption for decades and is equally applicable to both managerial and supervisory duties, regardless of whether the employee is an overtime-exempt executive. This definition results from a straightforward, textualist reading of the statute in the context it was created and is the only reasonable definition.

**2. The District Court erred in finding that Cheetah "floor managers" were not Plaintiff Bosley's "managers or supervisors" within the meaning of 29 U.S.C. § 203(m)(2)(B)**

As the District Court noted in its second summary Order, Plaintiffs pointed to six factors tending to show that Cheetah's floor managers were "managers or supervisors" within the meaning of 29 U.S.C. § 203(m)(2)(B):

1. handling complaints and grievances;
2. disciplining dancers;
3. providing for the club's safety and security and monitoring legal compliance measures;

4. directing the work of dancers when they monitored their stage performances and attire including directing dancers to leave the stage if their performance or clothing was inappropriate;

5. resolving disputes with customers or other dancers including ordering dancers to go to work in a specific portion of the club;

6. exercising discretion whether or not to recommend and introduce dancers to customers for lucrative VIP dances.

[Doc. 88, pg. 16]

In support of these allegations, Plaintiffs had shown that floor managers handled dancer complaints about customers and other dancers when the situation was urgent [Doc. 47-1 – pg. 3], and they would direct dancers to work in different areas of the club or to stay away from specific customers and dancers. [Doc. 47-1 – pg. 4] Floor managers were responsible for administering breathalyzer tests, observing dancers for signs that they are overly intoxicated and unsafe to drive, checking VIP rooms for dancer safety, and enforcing no smoking rules. [Doc. 47-1 – pg. 5] Floor managers also monitored the premises to ensure that dancers were safe when coming and going from the property, [Doc. 47-1 – pg. 5] were responsible for monitoring the club's legal compliance with respect to laws prohibiting customer–dancer contact, prostitution, and sexually explicit behavior, [Doc. 47-1 – pp. 5–6; Doc. 42-7 – pg. 87] and, when a floor manager believed that

they had witnessed a legal violation, they were authorized to order a dancer off stage or out of a VIP performance. [Doc. 47-1 – pp. 5–6]

Floor managers also made recommendations to customers for specific dancers to do performances; these recommendations were entirely at the floor manager's discretion and the performances that resulted from their recommendations were a major source of dancer income. [Doc. 47-1 – pp. 4–5] Bosley personally noticed how floor managers would no longer recommend dancers to customers if they stopped tipping them on top of the mandatory 10% tip pool contribution. [Doc. 42-7 – pp. 54–55] Bosley testified that she went along with paying them extra to "go with the flow to assist in [her] moneymaking with recommendations to tables, et cetera." [Doc. 42-7, 123:1–7]

Floor managers informed dancers when their turn to appear on stage had come to ensure that they appeared at that time. [Doc. 42-7 – pp. 61, 85] On one occasion, a floor manager became very upset when Bosley was late to a stage set and said that if it happened again, he wouldn't let her check into VIP all night. [Doc. 42-7 – pg. 85]

The District Court systematically brushed all of these facts aside, reducing floor managers to mere "bouncers." [Doc. 88, pg. 17] It ruled that handling complaints and grievances was "not part of a formal grievance process." [Doc. 88, pg. 18] It does not explain how this is relevant to the analysis. And it is not. Floor managers

were authorized to make one-the-spot decisions with respect to dancers and the *conditions of their work*, without further managerial oversight in at least most instances. That is exactly what a supervisor does. The fact that there was no "formal grievance process" strengthens Plaintiffs' argument rather than negating it. The floor managers were often the only and last authority. They were not just in charge of tossing out drunk customers.

The District Court also argues the floor managers' "diciplin[ing] employees" and "direct[ing] the work of employees," was merely limited to "in the moment" directives to get off stage or go somewhere else to avoid conflict or illegal activity. [Doc. 88, pg. 18] The District Court brushes these clearly supervisory duties aside and says that they "have been made on the spot when a problem arose and were not reviewed by management." Exactly, *that's the entire point*: floor managers had unfettered discretion over *dancers' work*. They were their supervisors. The District Court pointed to no authority that these duties were non-supervisory because they were not reviewed by managers. No such authority exists.

Then the District Court argued that floor managers do not "implement . . . legal compliance by ordering a dancer off stage if they witnessed a legal violation . . . ." [Doc. 88, pp. 18–19] arguing that the floor manager "is just executing policies someone else developed." Again, that is precisely *what supervisors do*;

management creates policy, supervisors implement it.[3] The District Court pointed to absolutely no legal authority in support of its conclusion that such work is fundamentally outside the scope of "supervision." No such authority exists.

The District Court finally waived aside Plaintiffs' argument that floor managers recommend customers to dancers because, as Plaintiffs themselves acknowledged, that "**does not fit neatly** into the categories enumerated in the executive exemption duties test." (emphasis added) Yet the District ignored the fact that the list of duties found at 29 C.F.R. § 541.102 is ***explicitly non-exhaustive***. If the District Court thought this important control over Bosley's ability to earn a living was not relevant to the analysis of whether floor managers were supervisors, and not analogous to other managerial duties, it certainly did not explain why. Plaintiffs contend that the significance of such authority is self-evident. If your co-worker can determine as a practical matter whether you, as a tipped employee, receive tip-generating work or not, they have at a bare minimum supervisory authority.

Finally, the District Court claims that "exchanging tips for referrals violated Defendant's policies, so it cannot be fairly said that this is part of a floor manager's

[3] *See, e.g.,* U.C. Berkeley Administration, "What's the difference between a supervisor and a manager?," https://hr.berkeley.edu/node/3818 (last accessed November 5, 2025) ("Managers have a significant, external focus (to the world outside the unit), whereas a supervisor has a more internal focused responsibility for implementing the manager's decisions through the work of subordinate employees.").

job duties." [Doc. 88, pg. 19] This analysis is fundamentally flawed on a legal basis. Rather than FLSA principles, the District Court seems to borrow respondeat superior or agency concepts from Georgia law limiting employer liability to instances where their "servant" is acting within the "scope of his business."[4] This concept is foreign to the FLSA, which examines "economic reality" rather than "technical concepts" to the test of employment.[5] The FLSA requires an employer to exercise reasonable, *proactive* diligence in following the law.[6]

Additionally, ***the club policy did not prohibit "exchanging tips for referrals"*** as the District Court claims. It merely stated that additional tips were ***not mandatory*** and demanded that dancers report to the general manager if they were ***harassed or coerced*** to share their tips. It does not address the situation here, where Bosley and other dancers gave house moms and floor managers tips simply in the hope of receiving preferential treatment. There is ***zero evidence*** that floor managers were not authorized to select and choose which dancers they directed tip-

---

[4] O.C.G.A. § 51-2-2 ("Every person shall be liable for torts committed by his wife, his child, or his servant by his command or in the prosecution and within the scope of his business, whether the same are committed by negligence or voluntarily.") *See generally Piedmont Hosp., Inc. v. Palladino*, 276 Ga. 612, 614 (2003).

[5] *See Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33, 81 S. Ct. 933, 936 (1961) ("In short, if the 'economic reality' rather than 'technical concepts' is to be the test of employment.").

[6] *See Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 469 (5th Cir.1979) (applying duty to investigate standard to FLSA good faith analysis: "Apathetic ignorance is never the basis of a reasonable belief," and the good faith defense "requires some duty to investigate potential liability under the FLSA.").

paying work to. Plaintiff Bosley says that they regularly did it and that assertion is unrebutted.

Third, the policy itself can be read as a "wink-and-a-nod" that says while there can be no "coercion" or "harassment" to tip, anything south of that is permitted. Cheetah could, of course, explicitly forbid dancers from giving tips to house moms and floor managers. But the actually existing policy artfully leaves open the possibility that a dancer can tip house moms and floor managers if she really "wants" to because she believes it will lead to additional tip-paying work or other perks.

Floor managers at Cheetah are no mere bouncers, and the District Court had insufficient facts before it to make such a determination as a matter of law. These floor managers could take dancers off stage, reprimand them for legal violations, and decide as a practical matter whether they would receive tip-generating work or not. This kind of power dynamic is exactly why Congress prohibited supervisors from taking a portion of employee tips. As such, the District Court's decision that floor managers were not Section 203(m)(2)(B) managers or supervisors as a matter of law was error.

### 3. The District Court erred in finding that Plaintiffs failed to show that Cheetah had knowledge of and "allowed" dancers to share tips with house moms in violation of 29 U.S.C. § 203(m)(2)(B)

In considering the scope of the term "allow" in the FLSA's § 3(m)(2)(B) tip-sharing prohibition, the District Court held that

> . . . an employer who affirmatively prohibits managers and supervisors from receiving portions of employee's tips does not violate § 203(m)(2)(B) so long as it does not tolerate or suffer violations of that statute to occur. Stated another way, an employer violates § 203(m)(2)(B) if a tipped employee shares a tip with a manager or supervisor and the employer either (i) does not have a policy against sharing tips with managers and supervisors or (ii) has such a policy but does not enforce it.

[Doc. 88, pp. 24–25] Plaintiffs do not argue against this standard, other than to point out that "suffer or permit" is the standard language used in the FLSA,[7] rather than "tolerate or suffer" as the District Court phrases it. Nor do Plaintiffs quibble with the District Court's conclusion that a plaintiff has the burden of showing that the employer "allowed" improper tip sharing to occur. The problem lies with the District Court's application of these standards as they relate to Cheetah's house

---

[7] The suffer or permit standard is used with respect to compensable time, i.e., an employer can only be held accountable to pay wages that it suffered or permitted to be performed. *See, e.g.,* 29 C.F.R. § 785.11 ("Work not requested but suffered or permitted is work time."). As Plaintiffs will show below, this standard has its source in 29 U.S.C. § 203(g) ("Employ" includes to suffer or permit to work") and should be applied analogously to the question of when an employer "allows" managers or supervisors to take a portion of an employee's tips.

moms and whether Defendant had knowledge that they were taking a portion of Plaintiff Bosley's tips.

a. **Defendant did not argue that it lacked knowledge of Plaintiff Bosley's tip sharing, and the District Court was not permitted to rule on that issue *sua sponte* without providing Plaintiffs notice and an opportunity to be heard**

First, Defendant did not argue at summary judgment that it lacked notice of dancer tip-outs to house moms. So Plaintiffs had no reason to try to prove it. Granting summary judgment on the basis of arguments not actually briefed by the parties defeats the very purpose of summary judgment and violates Fed. R. Civ. P. 56(f) as well as basic due process principles. *See Roe v. City of Atlanta*, 456 F. App'x 820, 822 (11th Cir. 2012) ("While a district court is permitted to raise new issues in deciding a motion for summary judgment, it must give notice to the parties. *See* Fed. R. Civ. P. 56(f)(2). Because no notice was given to Roe, we vacate on this ground.…"); *see also Couch v. Clark*, 725 F. App'x 808, 811 (11th Cir. 2018) ("A district court may enter summary judgment in favor of a party only after providing his opponent "notice and a reasonable time to respond." Fed. R. Civ. P. 56(f). "[T]his notice provision is not an unimportant technicality, but a vital procedural safeguard." *Massey v. Cong. Life Ins. Co.*, 116 F.3d 1414, 1417 (11th Cir. 1997). When no notice is given, litigants are deprived of their opportunity to formulate and prepare thorough and thoughtful responses to the motion before the court. *See id*. In light of the fundamental importance of notice, our court has

"strictly enforced the requirement that a party threatened by summary judgment must receive notice and an opportunity to respond." *Id.*"); *Kesler v. Barris, Sott, Denn & Driker, PLLC*, 482 F. Supp. 2d 886, 896 (E.D. Mich. 2007) (". . . although Plaintiff was placed on notice that she was facing a motion for summary judgment, the issues considered by the magistrate were not raised by Defendant. . . . it would be unfair to find that Plaintiff was unable to survive a motion for summary judgment on those grounds.…").

Plaintiffs had no notice that the question of Defendant's knowledge of the widespread tip-sharing was even at issue, and thus had no burden to prove it. It was improper for the District Court to raise the issue *sua sponte* without permitting Plaintiffs to respond with argument and, if needed, additional facts. The District Court's summary judgment order should be reversed on this basis alone.

#### b. The knowledge of managers and supervisors is imputed to an employer

Under the FLSA employers are imputed to have the knowledge of their managerial employees, and employers have a duty to inquire into how their own businesses are operated. *See Sidell v. MedMark Servs. Inc.*, No. 2:16-cv-176-RWS, 2017 U.S. Dist. LEXIS 220486, 2017 WL 6994574, at *5 (N.D. Ga. Aug. 3, 2017) ("Knowledge by supervisors . . . is typically imputed to the employer."); *see also Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 827-28 (5th Cir. 1973) (the company could not "disclaim knowledge when certain segments of its

management squelched truthful responses"); *Reich v. Department of Conservation & Natural Resources*, 28 F.3d 1076, 1082 (11th Cir. 1994) ("an employer's knowledge is measured in accordance with his 'duty . . . to inquire into the conditions prevailing in his business.' " (quoting *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 512 (5th Cir. 1969) (rejecting an actual knowledge requirement in the context of child labor)); *see also Hellmers v. Town of Vestal*, 969 F. Supp. 837, 845 (N.D.N.Y. 1997) (explicitly adopting tort principles to the FLSA context: " 'when the employer 'should have discovered it through the exercise of reasonable diligence.' ") (quoting *Carlisle Equip. Co. v. U.S. Sec'y. of Labor & Occupational Safety*, 24 F.3d 790, 793 (6th Cir. 1994)); *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 469 (5th Cir.1979) (applying duty to investigate standard to FLSA good faith analysis: "Apathetic ignorance is never the basis of a reasonable belief," and the good faith defense "requires some duty to investigate potential liability under the FLSA."). As another federal judge found, relying on *Brennan*, "[i]t does not make sense to permit an employer to disclaim knowledge of false reporting when its managers are allegedly to blame for the falsity. Defendants' lack of actual knowledge therefore does not provide an adequate basis for summary judgment in defendants' favor.*Stickle v. SCI W. Mkt. Support Ctr., L.P.*, No. 2:08-cv-00083 JWS, 2012 U.S. Dist. LEXIS 8255, at *22 (D. Ariz. Jan. 24, 2012).

The District Court, in holding that Plaintiffs failed to show that Defendant had knowledge of the illegal tip-sharing, ignores these basic principles that have characterized FLSA enforcement for decades. "Employers"—who, it is worth noting, can be multiple corporate entities, managers, and owners or shareholders, all of whom *can be held jointly and severally liable even in cases where they lacked personal involvement in an FLSA violation*—always operate through individuals, typically managers and supervisors. An employer who remains ignorant of how its management operates an enterprise and whether its managers are operating consistently with the FLSA's requirements, cannot point to that its ignorance to avoid liability.[8]

The District Court's reasoning, which would require an employer's actual knowledge (often impossible to prove), imperils every aspect of the FLSA's employee protections because it hands a free pass to employers who bury their heads in the sand and look away from illegal wage practices that would have been obvious had *any reasonable inquiry* been made, and despite the intentional acts of their managerial agents. When management violate the FLSA through their own affirmative actions, an employer (and often multiple employers) may be imputed with their knowledge and thus "allow" the violation to occur. The buck has to stop somewhere, with someone. And that someone is the employer.

---

[8] And of course, it bears repeating, Defendant has never claimed it was unaware.

#### c. Defendant had (at least) constructive knowledge of its managers' FLSA violations

While it would be fair and proper to find that Defendant was imputed to have the knowledge of its managerial employees who engaged in the illegal tip-sharing, the reality is that Plaintiffs in fact *did have evidence* that Defendant was aware of the tip-sharing with house moms. As Plaintiff Bosley testified in her deposition, "everyone was doing it. . . . it was just the way the club worked . . . I had to go with the flow." Doc. 42-7, 123:1–7 (emphasis added).

Cheetah is a nightclub where a written rule exists—at least in fine print on a piece of paper that dancers are handed at hiring, with no evidence that it is actually enforced. That policy states that DJ's and floor managers will get 10% of a dancer's tips, that "management" (that term is not clarified, and Defendant maintains that house moms are not managers) will not keep tips, and that dancers should report if they are harassed or coerced into giving their tips to other employees.

That's what the policy says. But then comes reality, which is quite different: Cheetah—as it actually operates—depends on dancers consistently paying house moms and floor managers as a standard practice. As Bosley testified, paying out house moms and floor managers in fear of loss of privileges and fear of loss of tip-generating work is par for the course at Cheetah. Had "Defendant" investigated the operations of its business with any diligence whatsoever, beyond the knowledge of

its own in-house management, then it would surely know that. *See, e.g., Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1321 (11th Cir. 2007) ("an employer can be charged with constructive knowledge even when an employee has not alleged a supervisor's direct knowledge" and "if an employer had an opportunity to acquire knowledge of an employee's work by using ***reasonable diligence***, then the employer can be charged with constructive knowledge.") (emphasis added).

Nothing in the record indicates that Cheetah used "reasonable diligence" to find out whether its house moms and floor managers were extorting or otherwise pressuring dancers to hand over their tips. Nothing in the record indicates that Cheetah did anything to find out who if anyone dancers were sharing their tips with outside the mandatory tip pool. The District Court was not entitled to find—as a matter of law—that Defendant had fulfilled its duties by merely having a written policy, whether or not it was actually enforced. At the very least, a jury gets to decide whether it had knowledge of the tip-sharing practices, constructive or otherwise.

Cheetah has attempted to nullify the FLSA with a piece of paper, while fully knowing that no reasonable dancer would create waves and endanger her own income by complaining to the general manager about the club's standard practices. This is no different than an argument that overtime premiums need not be paid as long there's a sign on the wall prohibiting employees from working overtime. The

FLSA's protections are mandatory in anticipation of just such situations involving greatly unequal power dynamics. This Court should not permit such a cynical end-run around the FLSA to persist.

**4. Conclusion**

Based on the foregoing, Plaintiffs–Appellants respectfully request that the Court find that Cheetah violated the FLSA by allowing house moms and floor managers to take Plaintiff Bosley's tips and remand this case to the District Court for trial.

Respectfully submitted this 5th day of November 2025,

**DELONG CALDWELL BRIDGERS FITZPATRICK & BENJAMIN, LLC**

*s/ Matthew W. Herrington*
Matthew W. Herrington
Georgia Bar No. 275411
Charles R. Bridgers
Georgia Bar No. 090791

101 Marietta Street NW
Suite 2650
Atlanta, Georgia 30303
Phone: (404) 979-3150
Fax: (404) 979-3170
matthew.herrington@dcbflegal.com
charlesbridgers@dcbflegal.com

**Certificate of Compliance with F.R.A.P. RULE 32(A)(7)**

The undersigned counsel certifies that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). It contains 6,164 words, excluding the parts exempted by 11th Cir. R. 32-4.

Dated: November 5, 2025

*s/Matthew W. Herrington*
Matthew W. Herrington
Ga. Bar No. 275411

**Certificate of Service**

I hereby certify that I have this day electronically filed the foregoing document using the Court's CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

Dated: November 5, 2025

*s/Matthew W. Herrington*
Matthew W. Herrington
Ga. Bar No. 275411